Robert Tauler, Esq. (SBN 241964)
rtauler@taulersmith.com
J. Evan Shapiro, Esq. (SBN 218481)
eshapiro@taulersmith.com
TAULER SMITH LLP
626 Wilshire Boulevard, Suite 1100
Los Angeles, California 90017
Tel: (213) 927-9270

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

ELIZABETH HAVILAND, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

ROKT US CORP., a Delaware corporation; and DOES 1 through 25, inclusive,

Defendants.

Case No. 2:26-cv-00582-DJC-AC

**SECOND AMENDED CLASS ACTION COMPLAINT FOR:**

1. **VIOLATIONS OF THE CALIFORNIA TRAP AND TRACE LAW (CAL. PENAL CODE § 638.51)**

**JURISDICTION**

1. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen of a different State or subject of a foreign state.

2. This Court has personal jurisdiction over Defendant because, on information and belief, Defendant has purposefully directed its activities to the Eastern District of California by regularly and knowingly engaging with individuals in California through use of its website (found at www.rokt.com) (the "Website") to conduct financially beneficial commercial surveillance on them. Defendant's illegal conduct is directed at and harms California residents, including Plaintiff, and others in California, and if not for Defendant's contact with the forum, Plaintiff would not have suffered harm.

3. In 2016, Defendant opened its U.S. Western Office in Santa Monica, California. Defendant's Santa Monica office serves Defendant's West Coast customers including customers based in California. Rokt also maintains an office in San Francisco, California. The Website includes an entire section devoted to Defendant's customers in the entertainment industry, attracting consumers based in California. The Website also lists Defendant's California-headquartered "partners" including LiveRamp, Inc., Twilio, Inc. and AppsFlyer, Inc.

4. Defendant conducts business in California, markets its services to companies doing business with California consumers, and deploys tracking technology on its Website that collects and transmits identifying information from California visitors, including Plaintiff.

5. Defendant purposefully directed its conduct toward California by intentionally deploying tracking and identification software on a nationally

accessible website while using California-registered data brokers and advertising technology vendors whose business model depends on identifying, profiling, and monetizing California residents. Defendant's conduct was not passive website operation. Defendant affirmatively embedded third-party tracking code into the Website so that, when a California resident loaded the Website from California, the Website automatically caused that resident's browser to transmit identifying routing, addressing, signaling, device, and behavioral information to Defendant's data broker partners.

6. Defendant knew, or reasonably should have known, that the DBSDKs installed on its Website would collect geolocation signals, IP-address-based location information, browser and device identifiers, referral information, page URL information, cookie identifiers, and other information reasonably likely to identify whether a visitor was located in California. The DBSDKs were therefore capable of recognizing that Plaintiff and other Class Members accessed the Website from California at or near the time of the surveillance.

7. Defendant's use of LiveRamp, NextRoll/AdRoll, and Outbrain was expressly aimed at California because those vendors operate as data brokers in California and are used for the commercial purpose of recognizing, profiling, retargeting, and monetizing California consumers. Defendant's choice to install those DBSDKs on its Website was an intentional act designed to create commercial value from the identification of visitors, including visitors located in California.

8. Plaintiff's claims arise directly from Defendant's California-directed conduct because Plaintiff was located in California when Defendant's Website caused her browser to transmit identifying electronic impulses to Defendant's data broker partners. But for Defendant's installation and use of the DBSDKs on the Website, Plaintiff's California-based visit would not have resulted in the disclosure of her identifying routing, addressing, signaling, device, and behavioral information to the Data Brokers.

9. Defendant derived commercial benefit from this California-directed surveillance because the information obtained through the DBSDKs allowed Defendant and/or its advertising technology partners to identify visitors, attribute website traffic, build or enrich profiles, facilitate retargeting, and improve the value of Defendant's marketing, analytics, and customer-acquisition efforts.

10. As described more fully herein, Defendant, through the Website and the data broker software, reaches into the devices of Website visitors located in California, depositing code and cookies onto the browsers and devices of those visitors in connection with the statutory and common law violations alleged by Plaintiff. Defendant intended and understood that such persons would suffer injury in California as a result of the actions underlying Plaintiff's claims, which involve deployment of the data broker software on the Website.

11. Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District; and (4) the injury to Plaintiff occurred within this District.

## PARTIES

12. Plaintiff Elizabeth Haviland ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California residing and located within the Eastern District of California.

13. Defendant Rokt US Corp. ("Defendant" or "Rokt") is a Delaware corporation that owns, operates, and/or controls www.rokt.com ("Website"), an ecommerce technology company that uses its Website to market, promote, and commercialize its advertising and ecommerce technology products.

14. The above-named Defendant, along with its affiliates and agents, are collectively referred to as "Defendants." The true names and capacities of the

Defendants sued herein as DOE DEFENDANTS 1 through 25, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. Plaintiff will seek leave of Court to amend the Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

15. Plaintiff is informed and believes that at all relevant times, every Defendant was acting as an agent and/or employee of each of the other Defendants and was acting within the course and scope of said agency and/or employment with the full knowledge and consent of each of the other Defendants, and that each of the acts and/or omissions complained of herein was ratified by each of the other Defendants.

## FACTUAL ALLEGATIONS

16. Rokt is the proprietor of www.rokt.com, a website that offers ecommerce technology applications.

17. Defendant has partnered with registered California Data Brokers in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors (the "Data Brokers," and each a "Data Broker"). Defendant has done this by installing Data Broker Software Development Kits ("DBSDKs") on its website.

18. DBSDKs are designed to track and correlate visitors by capturing electronic impulses designed to identify them. This is accomplished through "browser fingerprinting," a process by which Data Brokers are able to ascertain the identity of a website visitor by plotting hundreds of personal identifiers, including a user's geolocation, device information, identification and cross-referencing of malicious cookies installed on their devices, and other traits evident from a user's browser.

**Registered California Data Brokers**

19. Data Brokers are companies whose core business is to collect, aggregate, analyze, and sell or license personal and non-personal data about individuals and organizations. Data Brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

20. Data Brokers gather information from a wide variety of sources, including:

a. Public Records: Court records, property records, marriage licenses, voter registration rolls.

b. Commercial Sources: Retailers, financial institutions, online marketplaces, subscription services, and loyalty programs.

c. Web Activity and Cookies: Tracking users via cookies, pixels, and device fingerprinting across websites and apps.

d. Social Media and Online Platforms: Scraping public profiles and aggregating behavioral data.

e. Mobile Apps: Many apps transmit user data (e.g., location, contacts, usage) back to data brokers, either directly or via third-party Software Development Kits.

f. Third-party Agreements: Some companies directly sell or share user data with data brokers under contractual arrangements.

21. Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual. The data is then cross-referenced and linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources. Data Brokers then use algorithms and analytics to infer additional characteristics — e.g., estimating income, marital status, interests, or likelihood of pregnancy — based on patterns in the raw data.

22. Data Brokers are accumulating data and profiling individuals to an alarming extent. As the CEO of a Data Broker recently described the extent of their surveillance abilities as to an otherwise anonymous individual: "We know who she is, what she watches, what she reads, and who she lives with. [We] also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys. We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation."[1]

23. Given the amount of data available by way of the Data Brokers' practices, a company like Defendant has an incentive to partner with a Data Broker so that it can learn the identity of their website visitors in order to allocate marketing resources, including phone calls, mailings, social media advertisements, and emails, to likely customers, for its financial benefit.

24. Defendant has in fact partnered with the Data Brokers mentioned herein, by installing software on Defendant's website in order to deanonymize, identify and target prospective customers, while allowing Data Brokers to access, use, and monetize the data provided by Defendant, in manners that are never shared with anyone outside of their organization who does not purchase it.

**The DBSDKs are a Trap and Trace Device**

25. DBSDKs gather device and browser information, geographic information (including the state and/or city from which a device accesses a website), referral tracking, and URL tracking by running code or "scripts" on the Website to send user details to a Data Broker.

26. The DBSDKs have begun to collect information by the moment a user lands on the Website, before they have had any opportunity to consent.

---

[1] Lucas Ropek, Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users, March 15 2025 (Gizmodo.com).

27. The DBSDKs runs on virtually every page of Defendant's website, sending to the Subject Data Brokers tracking information to financially benefit both Defendant and the Data Brokers.

28. CIPA defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

29. The DBSDKs are a process to identify the source of electronic communication by capturing electronic impulses sent out from users' devices and identifying dialing, routing, addressing, and signaling information about or generated by users. The users are never informed that the Website is collaborating with Registered California Data Brokers to obtain their phone numbers and other identifying information.

30. The DBSDKs are "processes" within the meaning of Penal Code section 638.50 because they consist of JavaScript, pixels, cookies, server calls, and related software routines that automatically capture incoming electronic impulses from a user's browser and transmit identifying information to third-party Data Brokers.

31. The DBSDKs capture "routing, addressing, or signaling information" because they collect and transmit information used to route, address, identify, and process electronic communications, including IP address, URL, referrer URL, user-agent string, cookie IDs, pixel IDs, advertising IDs, timestamps, browser characteristics, device characteristics, and geolocation signals.

32. The DBSDKs are "reasonably likely" to identify the source of electronic impulses sent from devices visiting the Website. In fact, they are designed solely to meet this objective. The DBSDKs do not need to collect the contents of a communication to violate the California Trap and Trace Law. Their

function is to identify the source of an electronic communication by collecting non-content identifiers associated with the user, browser, device, network location, and website visit. That is precisely the type of source-identifying information covered by the statutory definition.

33. Defendant did not obtain a court order before installing the DBSDKs on its Website.

34. Defendant did not obtain the express or implied consent of Plaintiff or any of the members of the proposed Class to be subjected to data sharing with Registered California Data Brokers for the purposes of de-anonymization, profiling, and targeting.

35. Defendant is statutorily ineligible to assert consent as a defense to its illegal use of a Trap and Trace device. Under Penal Code § 638.51(b), a consent defense is only available to a "provider of electronic or wire communication service," which Defendant is not.

36. The California Invasion of Privacy Act ("CIPA"), California Penal Code § 630 *et. seq.*, imposes civil liability and provides for statutory damages for the installation of trap and trace software without a court order. *Id.* §§ 637.2, 638.51; *see Moody v. C2 Educ. Sys. Inc.*, No. 2:24-CV-04249-RGK-SK, 2024 WL 3561367 (C.D. Cal. July 25, 2024) (holding that Data Broker Software was properly alleged to be a trap and trace device because it communicates over the internet and the statutory definition of a trap and trace device expressly covers "wire communication" and "electronic communication," and is not limited to telephone lines).

**Defendant and the California Data Brokers**

37. Defendant's installation of the DBSDK's violates the California Trap and Trace law.

38. Specifically, Defendant has installed the SDKs of LiveRamp, Nextroll (Adroll), and Outbrain on www.rokt.com.

39. LiveRamp, Nextroll (Adroll), and Outbrain function as follows:

**LiveRamp**

40. LiveRamp is one of the largest data brokers in California, specializing in deanonymization of website users. The LIVERAMP DBSDK tracks online signals from a website visit and matches it with their vast database to create a universal serial number for a person called a "RampID." The LIVERAMP DBSDK functions as follows:

41. First, when the LIVERAMP DBSDK loads on a webpage, it immediately captures the user's identifiers present in that context – e.g. reading any first-party cookie ID or a platform's ID that the page passes, as well as standard header info like IP and user-agent.

42. Second, the data obtained by the LIVERAMP DBSDK is sent to LiveRamp's servers where LiveRamp combines the data obtained from a visit to Defendant's website with other data it has obtained about the individual both online and offline. This data includes name and postal address, email address, cookie IDs, and mobile device IDs.

43. Third, through this process, the user is matched with their pre-existing "RampID" (data broker serial number). LiveRamp's RampID is permanent, and designed to persistently track an individual across thousands of websites. RampIDs do not change with clearing cookies or switching devices. The RampID, and the data associated with it, is widely shared with dozens of ad tech partners so that all parties who pay for it can identify the user, and see the user's online habits.

**Nextroll (Adroll)**

44. NextRoll, Inc. (formerly known as AdRoll, Inc.) is a marketing technology company specializing in retargeting and targeted advertising services. NextRoll appears on the California Data Broker Registry, indicating it trades in the personal data it collects (for example, by assembling audience segments or profiles that are used in advertising). NextRoll's services reach across a vast

network of websites and advertising exchanges, and the company openly touts its ability to recognize users across different sites and even across devices for marketing purposes.

45. The NEXTROLL DBSDK is a snippet of JavaScript that website owners embed in their site's HTML, typically in the header. Once installed, the pixel tracks essentially every action a visitor takes on the site. NextRoll's own help center describes the AdRoll Pixel as code that "tracks everything your visitors are doing on your site" The NEXTROLL DBSDK functions as follows:

46. First, when a user loads a page, the NEXTROLL DBSDK executes and sends an HTTP request to NextRoll's servers, including various pieces of information about the visitor's session. According to NextRoll's documentation, the NEXTROLL DBSDK collects HTTP header data – this includes the user's IP address, their browser user agent (which reveals browser version and operating system), the referrer URL (i.e. where they came from), and the current page URL. In addition, the NEXTROLL DBSDK captures site-specific data: it attaches an "advertisable ID" and "pixel ID" to identify the website/ad account in NextRoll's system (so NextRoll knows which client's site the data came from). It then records user actions on the page (what NextRoll calls "Site Activity") such as page views, clicks on certain elements, form submissions, items added to cart, and other conversion events.

47. Second, NextRoll then assigns each browser a "User identifier" the first time the AdRoll pixel sees that browser. This is a persistent cookie stored in the user's browser (often named something like "adroll" or "nextroll" cookie) that allows NextRoll to recognize the same user on subsequent visits or on other websites that also have AdRoll tracking. NextRoll's ID cookie means the tracking persists beyond the single site. If another unrelated website also uses AdRoll, that same cookie ID will be recognized and the user's new visit will again be captured and associated with their existing profile.

48. Third, Nextroll platform performs “cookie matching,” meaning it will compare its own user identifier with identifiers used by other ad platforms in order to broaden the reach of tracking and ad delivery. For example, if NextRoll’s pixel finds a user, NextRoll can later synchronize that user’s ID with, say, a Facebook or Google cookie to continue tracking user activity across the internet, storing all of the information in each discrete user profile.

**Outbrain**

49. Outbrain is a content recommendation platform, advertising network and personalization engine for content. Outbrain is registered as a data broker in California.

50. The OUTBRAIN DBSDK functions as follows:

51. First, when a page loads, the OUTBRAIN DBSDK captures the user’s IP address and translates that IP into a general geolocation (city/region). It also notes the device type, browser type, operating system, and referring URLs. All of this happens via the web requests the browser makes to Outbrain’s domain to fetch content or ping for tracking.

52. Second, the OUTBRAIN DBSDK will drop a cookie on the user’s browser (if not already present) to assign a Unique User ID (UUID). This UUID is an identifier that Outbrain uses to keep track of that user on any Outbrain-enabled site. Outbrain’s systems catalogue and analyze the content you consume across partner sites associated with that UUID.

53. Third, the OUTBRAIN DBSDlogs information about the user’s interaction with the page and stores it in order to accumulate a browsing profile about a user without their consent.

**Plaintiff**

54. Plaintiff visited www.rokt.com on April 28, 2025. When Plaintiff did so, their identifying information by way of electronic impulses was sent to LiveRamp, Nextroll (Adroll), and Outbrain. The purpose of this transfer of data

from Defendant to the Data Brokers was for de-anonymization, profiling, and targeting. The transfer benefitted both the Defendant and the Data Broker financially.

55. Plaintiff did not merely view static content on the Website. When Plaintiff visited the Website from California on April 28, 2025, Defendant's Website caused Plaintiff's browser and device to initiate network communications with third-party domains associated with LiveRamp, NextRoll/AdRoll, and Outbrain. Those communications occurred automatically when the Website loaded, before Plaintiff knowingly consented to the disclosure of her identifying information to those Data Brokers.

56. The information transmitted from Plaintiff's browser and device included, at minimum, her IP address, browser user-agent string, device and browser characteristics, referring URL, current page URL, time and date of visit, cookie identifiers or attempted cookie identifiers, advertising or pixel identifiers associated with Defendant's Website, and geolocation information derived from Plaintiff's device and/or IP address. This information constituted routing, addressing, signaling, and identifying information reasonably likely to identify the source of Plaintiff's electronic communication.

57. The information transmitted to the Data Brokers was not limited to anonymous traffic statistics. LiveRamp, NextRoll/AdRoll, and Outbrain use persistent identifiers, cookies, cookie matching, RampIDs, UUIDs, and similar identifiers to connect a website visit to an existing person, browser, device, household, or profile. As a result, Plaintiff's visit to Defendant's Website was capable of being linked to Plaintiff's existing data broker profiles and used to identify, recognize, retarget, categorize, or further profile Plaintiff.

58. Defendant's Website transmitted Plaintiff's identifying information to Data Brokers for the purpose of de-anonymization, attribution, retargeting, analytics, marketing optimization, and commercial profiling. Defendant thereby caused

Plaintiff's private browsing activity on Defendant's Website to be associated with persistent identifiers maintained by third-party Data Brokers.

59. On information and belief, Data Brokers took Plaintiff's information and added it to their profiles of Plaintiff. In turn, Defendant received other relevant data obtained by the Data Brokers regarding Plaintiff. The Data Brokers could then use data regarding Plaintiff's visit to further profile Plaintiff, with the objective of monetizing this data by selling or licensing it to other entities, including law enforcement. In this regard, a recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase personal data to further their exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force."[2]

60. There is no way for Plaintiff to learn what the Data Brokers did with Plaintiff's data, including what inferences the Data Brokers have gleaned from it, or when, why and to whom the Data Brokers have sold or licensed Plaintiff's data. As such, Plaintiff has been injured by Defendant's surveillance practices.

61. Plaintiff suffered a concrete injury because Defendant caused her identifying information and private website-visit information to be disclosed to third-party Data Brokers without her knowledge, consent, or a court order. This disclosure invaded Plaintiff's legally protected privacy interest in controlling the dissemination of information that identifies her device, browser, location, and browsing activity.

62. Plaintiff's injury is not speculative. The disclosure occurred at the moment Defendant's Website caused Plaintiff's browser to communicate with the Data Brokers. At that moment, Plaintiff lost control over her identifying information, and third-party Data Brokers obtained information about Plaintiff's visit to Defendant's Website that they otherwise would not have received.

---

[2] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole

63. Plaintiff also suffered injury because the disclosed information was reasonably capable of being linked to existing data broker profiles concerning Plaintiff. Data Brokers do not collect isolated pieces of information for passive storage; they collect identifiers to connect website activity to persistent profiles, infer personal characteristics, and monetize those profiles through advertising, analytics, licensing, sale, or other commercial use.

64. Plaintiff was further injured because Defendant's conduct exposed her to continuing downstream use of her information by entities operating outside Plaintiff's knowledge and control. Plaintiff cannot determine the full scope of the disclosure, the identity of every downstream recipient, the inferences drawn from the data, the duration of retention, or the future uses of the data because those facts are uniquely within the possession of Defendant and the Data Brokers.

65. Plaintiff has a concrete interest in preventing unauthorized trap-and-trace surveillance of her electronic communications. Defendant invaded that interest by installing and using processes that captured and transmitted identifying routing, addressing, signaling, device, and geolocation information from Plaintiff's electronic communications without first obtaining a court order.

66. Plaintiff was never informed of, and therefore could not have consented to, data collection by the Data Brokers for mercantile purposes. Plaintiff has no way to know the scope of the injury suffered because the Data Brokers operate in secret and without public disclosure of their operations.

67. Plaintiff's awareness that some websites may contain tracking technology did not disclose the specific DBSDKs installed on Defendant's Website, the specific Data Brokers receiving her information, the specific identifiers transmitted, the matching of her visit to persistent data broker profiles, or the downstream commercial use of her information. General awareness of the existence of online tracking is not consent to a particular company's unauthorized installation and use of trap-and-trace processes.

## CLASS ALLEGATIONS

68. Plaintiff brings this action individually and on behalf of all others similarly situation (the "Class") defined as follows:

> **All persons within California whose identifying information was sent to a Data Broker as a result of visiting the Website within the limitations period.**

69. NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

70. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

a. Whether a DBSDK is a trap and trace process as defined by California law;
b. Whether Plaintiff and Class Members are entitled to statutory damages;
c. Whether Class Members are entitled to injunctive relief; and
d. Whether Class Members are entitled to disgorgement of unlawfully obtained data.

71. TYPICALITY: As a person who visited Defendant's Website and whose personal information was fingerprinted and de-anonymized by a Data Broker, Plaintiff is asserting claims that are typical of the Class.

72. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of The Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse

to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

73. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class Member is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

## **FIRST CAUSE OF ACTION**

### Violations of California Trap and Trace Law

### Cal. Penal Code § 638.51 (the "California Trap and Trace Law")

74. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

75. The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

76. A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." *Id.* § 638.50(c).

77. Defendant uses a trap and trace process by deploying the DBSDKs on its Website because the DBSDKs are designed to capture signaling information of Website visitors. As such, the DBSDKs is designed precisely to identify the source of the electronic and wire communications sent from the devices of users in California visiting the Website in violation of the California Trap and Trace Law.

78. Defendant did not obtain a court order before installing the DBSDKs on the Website. Defendant also did not obtain consent from Plaintiff or any of the

Class Members before using trap and trace technology to identify visitors to its Website.

79. CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also C2 Educ. Sys. Inc.*, 2024 WL 3561367.

**PRAYER**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel;
2. An order that data unlawfully obtained be disgorged;
3. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;
4. Statutory damages pursuant to CIPA;
5. Reasonable attorneys' fees and costs; and
6. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

DATED: May 29, 2026

TAULER SMITH LLP

By: */s/ Robert Tauler*
Robert Tauler, Esq.
*Attorney for Plaintiff*

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED: May 29, 2026

TAULER SMITH LLP

By: *__/s/ Robert Tauler__*
Robert Tauler, Esq.
*Attorney for Plaintiff*